UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case. |
| STEPHEN DERRICK MENDENHALL, | ) | No. 18-41006-JMM |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| STEPHEN DERRICK MENDENHALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Case. |
| v. | ) | No. 19-8010-JMM |
| | ) | |
| NAVIENT CORPORATION and U.S. | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### *Introduction*

Stephen Derrick Mendenhall "(Plaintiff") seeks a discharge of his student loan

debt on the basis of undue hardship.  Dkt. No. 16.  The lender, Navient Corporation

("Defendant") opposes the discharge.  The parties tried the case before this Court, after

which the matter was deemed under advisement.  After considering the briefing, exhibits,

MEMORANDUM OF DECISION – 1

testimony, and oral argument presented, as well as the applicable law, the Court now issues the following decision.  Fed. R. Bankr. P. 7052; 9014.[1]

### Findings of Fact

Plaintiff, now forty years old, attended Brooks Institute of Photography in California from July 2004–September 2007, at which time he graduated with a bachelor's degree in film and video production.  That educational institution has been the subject of a class action suit based upon fraudulent misrepresentations to prospective students, and has since closed its doors.

In order to pay the tuition, Plaintiff obtained both federal and private loans.  His federal loans total about $75,000 and are owed to the United States Department of Education, but are serviced by Defendant ("Federal Loans").  The Federal Loans are currently in forebearance after Plaintiff filed a borrower defense application for students who were defrauded by the school.  His claim was denied, but he and other similarly situated Brooks Institute graduates have appealed that decision, which appeal is pending.  Prior to the forebearance, the Federal Loans were approved for income-based repayment, and the payment was approximately $300 per month.  While the Department of Education was originally a named defendant in this action, it entered into a stipulation with Plaintiff by which the parties agreed that the loans owed to it by Plaintiff do not impose an undue hardship upon Plaintiff and are not dischargeable.  Dkt. No. 32 at ¶¶ 5-

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

MEMORANDUM OF DECISION − 2

6.  A judgment and order of nondischargeability was entered by this Court on February

26, 2020, Dkt. No. 35, and as such, the United States Department of Education did not

participate in the trial.

The remaining loans are private loans owed to and serviced by Defendant,

formerly known as Sallie Mae, and it is these loans that are specifically at issue.  Between

March 12, 2004 and September 20, 2005, Plaintiff applied for three separate loans with

Sallie Mae ("Loans").  Ex. 200.  Following approval of the Loans, Sallie Mae or

Defendant disbursed a total of $76,654 in funds to Plaintiff between July 2004 and May

2006.  Ex. 202.  However, thanks to the capitalization of interest,[2] the passage of time,

plus a myriad of added fees, by July 2013 the principal was $143,552.06, the

accumulated interest was $76,912.39, and the accumulated fees were $39,893.20, for a

grand total of $260,357.65 owed.  *Id.*  As of sometime after October 31, 2018, the interest

rate on the Loans with Defendant was 13.625%.  Ex. 205 at p. 6.[3]  As of November 1,

2018, the amount owed on the Loans totaled $407,912.84.  Ex. 104.

---

[2]  When interest is capitalized, it becomes principal.  As such, from that time forward, interest literally
accrues on interest.

[3]  The only reference to the interest rate on the Loans is found in responses to Defendant's first set of
interrogatories.  Ex. 205.  Although the document is undated, Plaintiff's answer references the balance of
the Loans as of October 31, 2018, thus the Court may presume that the document is dated sometime after
that date.  Ex. 205 at p. 5.  At trial, the Court questioned the parties about the current interest rate, but they
did not know what it was.

MEMORANDUM OF DECISION − 3

For a short time following graduation, Plaintiff testified that he made small[4] payments toward the Loans, but is unclear about how the payments were disbursed. He further testified that in the early years of the Loans, he was required to make a $150 payment each time he requested forebearance.

Upon graduating, Plaintiff discovered that film work is often contract work by nature and generally does not produce the income levels advertised by the school. Rather, an individual with his skills and education is usually hired on contract to complete a certain job. The work is not steady, and often provides no benefits. More concerning, the pay did not come even close to providing the "doctor's salary" promised in the advertisements for the school, which suggested their students would pay a doctor's tuition but would receive a doctor's wages in the end. As noted above, these claims gave rise to a lawsuit. Plaintiff did not actively participate in this suit,[5] but believes as a graduate he may be part of the class.

In 2008, Plaintiff married Alina Mendenhall. He continued to perform contract work, but found the work generated a very modest income, which was not steady and provided no benefits. The couple moved around in search of employment opportunities. Between 2007 and 2015, the couple lived in several states, and Plaintiff had a couple of

---

[4] He refers to the payments as "token" payments, *see* Ex. 205 at pp. 7, 14; at trial he testified that he made $600 monthly payments for a time.

[5] Plaintiff testified that he filed a borrower defense claim which was initially denied, and that decision has been appealed. The suit against the Brooks Institute was apparently a separate, possibly class action, litigation. There was no additional evidence provided to the Court about either the claim or the lawsuit.

MEMORANDUM OF DECISION – 4

salaried jobs, but never earned more than $45,000 annually.  This salary barely met the
needs of their growing family, and did not provide sufficient income to repay the Loans.

In 2015, Plaintiff obtained an hourly position with Brigham Young University –
Idaho ("BYU-I"), located in Rexburg, Idaho, as the school's video production
coordinator.  His hourly wage paid him about $45,000 annually.  However, he earned
overtime and, importantly, he was provided with health insurance coverage, which he had
previously been paying for out of pocket in the amount of nearly $500 per month.  Since
beginning his work at BYU-I, Plaintiff has applied for and received several promotions.

Beginning in 2018, he was promoted to his current position of media creation
manager, in which he supervises three employees and numerous student employees.  The
position is salaried, with a current gross income of approximately $72,300 annually, or
$3,012.48 gross per paycheck, which translates to roughly $6,024.96 gross per month.
Exs. 100; 104.  Plaintiff receives cost of living increases annually of about 2.5–3 percent,
but does not foresee any increases in income beyond that.  He has also sought other jobs
even while at his present employment, including internal jobs at BYU-I.  It is his hope to
one day obtain a master's degree or to perhaps move into a faculty position, in order to
further increase his income.

Since graduation, Plaintiff has sought to enhance his skills.  He has obtained
certificates in specialized editing software, sound design, color editing, and even drone
piloting.  Some of these courses were subsidized by BYU-I.  Until his most recent
promotion, Plaintiff regularly sought outside contract work to provide additional income,

MEMORANDUM OF DECISION − 5

including contract video editing and providing training to others.  He established an "S" corporation through which he managed his side work.  But the work was always inconsistent.  On a good month, Plaintiff testified he would receive about $200, but other months he netted nothing.[6]  Moreover, the side work comes with some attendant expenses, such as having to keep and maintain a separate computer for the video editing, as well as tax preparation costs.  Since receiving the most recent promotion at BYU-I, however, Plaintiff does not actively seek as much contract work.  The supervisory nature of his position does not lend itself to such outside work, as Plaintiff finds he is essentially always "on call" to answer questions and provide assistance.

Plaintiff's spouse, Alina Mendenhall, has only worked outside the home for a short time early in their marriage, and has completed only a small amount of inconsistent post-high school education.  She began her studies at Boise State University, but then the couple moved to Utah.  While living there, she began dental assistant school, but then the family moved again so she had to give up those studies.  After they had children, Alina remained at home to raise them.  Given her education and general lack of work experience, she believes at best she could net little more than the cost of childcare for the children.  However, a benefit of employment at BYU-I is that spouses may attend classes at no cost, having to pay only for textbooks.  She is currently studying Family and Consumer Science, with a desire to obtain a teaching degree and teach in the secondary

---

[6] Plaintiff's schedule I indicates that he earns $448 monthly from this outside source.

MEMORANDUM OF DECISION − 6

schools, but recognizes that Rexburg, Idaho is not a large job market.  Moreover, she

currently takes only 1-2 classes per semester due to the demands of raising small

children, so she anticipates it will be at least 4-5 years before she can graduate.  She

occasionally brings home a small amount of income by babysitting other children on an

as-needed basis.

The family has always been careful with their finances and their assets are modest.

The family of six owns two vehicles.  Both were purchased used, are over ten years old,

and have high mileage.  Ex. 104.  They have $15,000 in a 401k and $4,500 in another

retirement account.  *Id*.  They rent a home and make monthly rent payments in the

amount of $1,175.  Ex. 103.  The "S" corporation, Mendenhall Inc., has $268 in assets.

Ex. 104.

The family takes infrequent and inexpensive vacations, and generally live quite

modestly.  Alina has a credit card, but does not maintain a balance on the card.  They

save for retirement, rainy days, and for larger purchases such as vehicle purchases and

repairs.  At the time of the trial, Plaintiff was depositing approximately eight percent of

his gross income into a savings account, totaling $241.84 per paycheck.[7]  Exs. 100; 102.

Plaintiff and Alina testified they do this because their budget will not support

emergencies and large expenses, so they save each month for those eventualities.  They

tap this fund when car and appliance repairs require it.  The savings balance has been

---

[7] As will be discussed below, the Court is using the most current income figures available to it.

MEMORANDUM OF DECISION − 7

able to build up recently—$13,909.89 at the time of trial[8]—but they have an expensive car repair coming up, and new tires will be necessary in the near future.  Ex. 102. Moreover, due to their current debt-to-income ratio, it is extremely difficult for Plaintiff and Alina to qualify for credit, and next to impossible to obtain a loan for a large purchase, such as for a vehicle, and so they must save up as much as possible in advance. For example, they had to use Alina's mother as a credit reference to obtain an approximately $8,000 loan to buy one of their used family vehicles.  They have completely drawn down the savings fund in the past, when necessary.

Plaintiff has funds deducted from his paycheck to go toward retirement.  The sum of $210.89 per paycheck is deposited into a 401(k) account.  Ex. 100.  These retirement investments reflect just over seven percent of his gross income each paycheck.  The couple has met with financial managers who have recommended that they put even more money toward retirement, but they cannot afford to do so.  Plaintiff's paystub also reflects an employer contribution to his retirement account, but it is not clear whether Plaintiff must make a retirement contribution in order to qualify for the employer contribution.

Finally, Plaintiff also makes a charitable contribution to his church of approximately $400 per month, which represents approximately ten percent of the

---

[8] Some of this total is apparently attributable to the 2020 CARES Act stimulus payment, which Plaintiff testified he deposited into the savings account.

MEMORANDUM OF DECISION − 8

couple's net monthly income.  Ex. 103.  Both Plaintiff and Alina testified that they do not consider this optional or discretionary.

In 2009, the minimum payment on the Loans was $1,900 per month.  Ex. 205 at pp. 7; 14.  As of 2018, Plaintiff's minimum monthly payment requirement was $2,990.94, but payments in that amount would never pay off the balance, especially given the 13.625% interest rate.  Ex. 205 at pp. 5–6.  Plaintiff estimates that in order to pay down the Loans over a 20-year period, monthly payments of at least $5,000 would be required, and in the end, total payments on the loans would be approximately $1.2 million.  *Id.* at p. 6.  He testified that he has sought help from debt counseling/debt reduction services, and in 2010, the counselor informed Plaintiff that a monthly payment of $4,500 would be necessary to pay down the debt; in the Fall of 2018, another counselor indicated that a payment of nearly twice that amount would be necessary.  *Id.* at p. 8.

Since graduation, Plaintiff has attempted many times to negotiate a payment plan with Defendant.  He testified that he spoke with the servicer of the Loans numerous times per year early on, and once or twice per year recently.  Plaintiff testified that Defendant has never offered an income-based solution, or anything other than payments of at least $1,900 per month.  It has offered forebearance, and Plaintiff has accepted that offer on a number of occasions.  However, somewhat belatedly, Plaintiff discovered that each time the Loans were placed into forebearance, the interest was capitalized, and as such, it

MEMORANDUM OF DECISION – 9

became principal, and interest began to accrue on that new, higher, amount, driving the balance up considerably.

On three occasions, Plaintiff has attempted to use bankruptcy to manage his student loan debt.  The first time was in Iowa in 2010, when he discharged his debts (largely his wife's wedding ring, a vehicle loan, and a small amount of credit card debt) so that he could free up sufficient income to pay off his student loans.  But even with the consumer debt discharged, he still did not have sufficient income to make any significant headway on the student loan debt.

The second bankruptcy filing occurred in Idaho in 2017.  He filed a chapter 13 case, *In re Mendenhall*, 17-40592-JDP, but the case was dismissed because Plaintiff's student loan debts exceeded the maximum debt permissible under chapter 13.  Finally, Plaintiff filed the instant bankruptcy petition on November 1, 2018.  Ex. 104.  Alina is not listed as a co-debtor on the petition.  *Id.*

The schedules list a total of $482,700.84 in student loans, comprising the Federal Loans with totaled $74,788 at the time of filing, and the Loans at issue in this decision, totaling $407,912.84.  Ex. 104.  Notably, the student loans are the *only* debts listed on Plaintiff's schedules.  *Id.*  The schedules were later amended to include an asset listed as "potential recovery under multi-state settlement against Career Education Corp" in an unknown amount.  *In re Mendenhall*, 18-41006-JMM at Dkt. No. 20.

Plaintiff estimates receiving a tax refund in the amount of $4,100 this year, but testified that some of it will be utilized to pay the tax preparation professional.  He also

MEMORANDUM OF DECISION − 10

already received $4,400 from the Internal Revenue Service for the 2020 CARES Act stimulus payment. Plaintiff deliberately opted to not pay those amounts toward the student loan debt, reasoning that any such payment would not make any impact on the principal owed.

Plaintiff commenced this adversary proceeding on January 22, 2019, seeking a discharge of his student loan debt. As noted above, he stipulated with the Department of Education on the Federal Loan, and thus that loan is not part of this decision. The Court conducted a trial on July 16, 2020, and the matter was thereafter taken under advisement.

### *Conclusions of Law and Disposition*

A.    Dischargeability of Student Loans Generally

Section 523(a)(8) of the Bankruptcy Code provides that certain kinds of educational debts are not discharged in bankruptcy unless repayment of the debt would result in undue hardship.[9] Specifically, this section has been interpreted to except four types of educational claims from discharge:

---

[9] The Code provides that a discharge does not discharge an individual debtor from any debt–
  (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for–
    (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
      (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
    (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

MEMORANDUM OF DECISION − 11

> (1) loans made, insured, or guaranteed by a governmental unit; (2) loans
> made under any program partially or fully funded by a governmental unit or
> nonprofit institution; (3) claims for funds received as an educational
> benefit, scholarship, or stipend; and (4) any "qualified educational loan" as
> that term is defined in the Internal Revenue Code. *Institute of Imaginal
> Studies v. Christoff (In re Christoff)*, 527 B.R. 624, 632 (9th Cir. BAP
> 2015) (quoting *Benson v. Corbin (In re Corbin)*, 506 B.R. 287, 291 (Bankr.
> W.D. Wash. 2014)).

*In re Kashikar*, 567 B.R. 160, 165 (9th Cir. BAP 2017).

In the case at bar, Plaintiff has not advanced the argument that the loans he entered

into for the purposes of attending the Brooks Institute do not fall within the ambit of

§ 523(a)(8). As such, they are nondischargeable in Plaintiff's bankruptcy case unless

Plaintiff can demonstrate an undue hardship.

B.      "Undue Hardship" and the *Brunner* Test

While the Code does not contain a definition of "undue hardship," a standard has

emerged, and endured, despite significant increases in the cost of college tuition. In this

circuit, the consideration of undue hardship relies on what is commonly known as the

"*Brunner* test," first established in the case of *Brunner v. New York State Higher Educ.

Servs., Corp. (In re Brunner)*, 831 F.2d 395, 396 (2d Cir. 1987), and adopted by the Ninth

Circuit in the case of *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108,

1112 (9th Cir. 1998).

MEMORANDUM OF DECISION − 12

Under this standard,[10] the Plaintiff must prove that: (1) he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if required to repay the Loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and (3) he has made good faith efforts to repay the Loans. *Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878, 882 (9th Cir. 2006) (citing *In re Pena,* 155 F.3d at 1111; *Brunner,* 831 F.2d at 396). The Court will consider each of these prongs in light of the facts presented in this case.

C.   Application of the *Brunner* Test to the Facts Presented

*1.  Minimal Standard of Living*

This first prong necessitates that Plaintiff prove he cannot maintain a minimal standard of living if he is required to repay the Loans. The *Brunner* test requires the Court to consider the Plaintiff's "current" income and expenses. *In re Pena,* 155 F.3d at 1112. To meet this requirement, he must demonstrate more than simply tight finances, but need not reach the level of utter hopelessness. *Educ. Credit Mgmt. Corp. v. Jorgensen (In re Jorgensen),* 479 B.R. 79, 87 (9th Cir. BAP 2012) (quoting *United*

---

[10] In his brief and again at trial, Plaintiff asked this Court to disregard the binding precedent in this jurisdiction and utilize some other, unspecified, standard. Dkt. No. 45 at p. 4. This Court declines to accept that invitation. The *Brunner* test, via *Pena*, is the law of the Ninth Circuit, and this Court is not at liberty to ignore that precedent. However, this Court urges the Ninth Circuit to reassess the test for undue hardship in light of changes to § 523(a)(8) since the adoption of *Brunner,* as well as the realities of modern student lending and college tuition costs. *See In re Roth*, 490 B.R. 908 (9th Cir. BAP 2013) (Pappas, J., concurring).

MEMORANDUM OF DECISION − 13

*Student Aid Funds v. Nascimento (In re Nascimento),* 241 B.R. 440, 445 (9th Cir. BAP 1999)).  Rather, the proper inquiry is whether it would be "unconscionable" to require Plaintiff to take steps to earn more income or reduce his expenses.  *Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 495 (9th Cir. BAP 2002); *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088 (9th Cir. 2001); *In re Nascimento,* 241 B.R. at 445.  Plaintiff is expected to live, however, within the strictures of a frugal budget in the foreseeable future.  *Ritchie v. Northwest Educ. Loan Assn. (In re Ritchie)*, 254 B.R. 913, 917–18 (Bankr. D. Idaho 2000)  In deciding whether Plaintiff can maintain a minimal standard of living if required to repay the student loans, the Court must carefully examine his monthly income and expenses. *Id.* (citing *In re Pena,* 155 F.3d at 1112; *Weil v. U.S. Bank et al. (In re Weil)*, 00.2 I.B.C.R. 110, 111 (Bankr. D. Idaho 2000)).

### a.  Plaintiff's Income and Expenses[11]

Plaintiff's most recent paystub[12] indicates the following income and deductions:

---

[11] For ease, the Court will use rounded numbers.

[12] In order to consider the most current salary and deduction figures, the Court utilized Plaintiff's most recent paystub, dated June 23, 2020, and because Plaintiff is paid bi-monthly, the Court multiplied each of the figures by two in order to generate monthly totals.  Ex. 100.

MEMORANDUM OF DECISION − 14

| Plaintiff's Income | |
|---|---|
| Gross monthly wages from BYU-I | $6,025 |
| Side income from "S" Corp. | + 150[13] |
| Total gross monthly income | $6,175 |

| Payroll Deductions | |
|---|---|
| Tax, Medicare, Social Security | $574 |
| Voluntary retirement: | 422 |
| Insurance: | + 183[14] |
| Total payroll deductions: | $1,179 |

| Total Monthly Income Calculation | |
|---|---|
| Total gross monthly income | $6,175 |
| Total payroll deductions | -1,179 |
| Total monthly income | $4,996 |

The testimony and evidence admitted at trial, including the Plaintiff's bankruptcy

schedules, proved the following expenses:

| Expenses Listed on Schedule J | |
|---|---|
| Rent | $1,175 |
| Renter's insurance | 13 |
| Home upkeep expenses | 100 |
| Total utilities | 480 |
| | |

---

[13] While Plaintiff listed $448 in monthly income from the "S" Corporation in his schedules, at trial he testified that "on a good month," his side jobs would net $200, but some months he made no extra income. He also testified that those side jobs bring in "less than $200" per month, and that his current position leaves little time for outside projects. Based upon the evidence presented, for the purposes of this analysis, the Court will include $150 in monthly income from outside jobs.

[14] In reaching this figure, the Court included not only the pre-tax deductions, totaling $ 91.45 per paycheck, but also the "24 Hour AD&D" totaling $0.28 per paycheck. At trial, Plaintiff testified that the payroll deductions are now $1,179 per month.

MEMORANDUM OF DECISION − 15

| | |
|---|---|
| Food/housekeeping | 1,050[15] |
| Education costs | 100 |
| Clothing and laundry | 200 |
| Personal care products | 150 |
| Medical and dental expenses | 276 |
| Transportation | 200 |
| Entertainment | 20 |
| Life insurance | 62 |
| Vehicle insurance | 86 |
| Tax preparation and home office supplies | 50 |
| Birthday/holiday gifts | 75 |
| Avery Law | 300 |
| Alina's credit card payment | +   25 |
| Total monthly expenses on schedule J | $4,362[16] |

| Additional Expenses Described at Trial | |
|---|---|
| Charitable contributions | $400 |
| Savings deposits | + 484 |
| Total additional expenses | $884 |

| Total Expense Calculation | |
|---|---|
| Total monthly expenses from schedule J, as modified | $4,362 |
| Total additional expenses | + 884 |
| Total monthly expenses | $5,246 |

Taking the Income and Expense totals together yields the following:

| Net Monthly Income Calculation | |
|---|---|
| Total monthly income | $4,996 |
| Total monthly expenses | - 5,246 |
| Net monthly income | $ -250 |

---

[15] Alina testified the monthly food expense is now over $1,000, as the children are getting older.

[16] The Court recognizes the inherent fallacy of utilizing income numbers from June 23, 2020 and expense figures from the petition date, November 1, 2018. The Court has modified all expense figures where there was trial testimony to support the modification.

MEMORANDUM OF DECISION − 16

From this figure, the Court will consider if any of Plaintiff's expenses are not

reasonably necessary for purposes of a § 523(a)(8) undue hardship analysis, in order to

determine if there is discretionary income left over with which to pay some or all of the

Loans.  *Craig v. Educ. Credit Mgmt. Corp. (In re Craig)*, 579 F.3d 1040, 1045 (9th Cir.

2009).

At trial, counsel for both Plaintiff and Defendant questioned Plaintiff and Alina

regarding some of their expenses.  After considering the testimony presented, the Court

finds the bulk of Plaintiff's expenses to be reasonable and consistent with a minimal

standard of living.  However, there are certain expenditures which the Court will address

specifically:  voluntary retirement contributions, life insurance, charitable contributions,

payments to Plaintiff's counsel, and savings account deposits.

### b.  Retirement Contributions

The Ninth Circuit has held that whether to decline a discharge due to expenses

which may be beyond the minimal standard of living is discretionary with the court.  *In

re Birrane*, 287 B.R. at 496 (citing *In re Rifino,* 245 F.3d at 1087).  For example,

> [s]ome courts have declined to discharge student loan debt where the
> debtor's budget included items such as cable television, a new car, and
> private schooling for a child. *See Commonwealth of Va. State Educ.
> Assistance Auth. v. Dillon,* 189 B.R. 382, 385–86 (Bankr. W.D. Va. 1995)
> (denying discharge of educational debt and finding debtor incurred $35 per
> month on cable television); [*Pa. Higher Ed. Assistance Agency v. Faish (In
> re Faish),* 72 F.3d 298, 307 (3rd Cir. 1995)] (rejecting claim of undue
> hardship by debtor who wanted to buy a car rather than continue to take the
> bus); *Perkins v. Vermont Student Assistance Corp.,* 11 B.R. 160, 161
> (Bankr. D. Vt. 1980) (finding that purchase of new car was self-imposed
> hardship); *Conner v. Ill. State Scholarship Comm'n (In re Conner),* 89 B.R.

MEMORANDUM OF DECISION − 17

744, 749 (Bankr. N.D. Ill. 1988) (finding that choosing to send children to private school was self-imposed hardship).

*In re Rifino*, 245 F.3d at 1088.

Under the facts presented here, the Court cannot find that Plaintiff's contributions to his retirement account constitute expenses which are beyond the minimal standard of living. At trial, Plaintiff testified that he deposits a total of $ 210.89 per paycheck, or just over seven percent of his gross income into a Roth 401(k) account. Despite being counseled to contribute a larger amount, he testified he cannot afford to do so. The Court finds this amount to be reasonable. *See McDowell v. Educ. Credit Mgmt. Corp. (In re McDowell)*, 549 B.R. 744, 754–55 (Bankr. D. Idaho 2016) (this Court did not question a retirement fund payroll deduction in the amount of approximately $300, which represented about seven percent of her gross income, but simply utilized the net pay amount included in the schedules); *In re Carlson-Callow*, No. 05-04260-JDP, 2008 WL 2357012, at *5 (Bankr. D. Idaho June 6, 2008) (acknowledging that courts have been willing to allow a modest contribution by a student loan debtor towards retirement, and finding that the debtor's contribution of eight percent of her gross income to her 401(k) account was reasonable, as was her repayment of a loan from her 401(k) account, but held that the three percent contribution to the employee stock purchase plan was excessive); *Twitchell v. Educ. Credit Mgmt. Corp. (In re Twitchell),* 04.2 I.B.C.R. 66, 67 (Bankr. D. Idaho 2004) (considering a 40-year-old debtor in poor health, the Court found it "reasonable and prudent that [the debtor] set aside a modest sum each month for her

MEMORANDUM OF DECISION − 18

retirement needs," and that "forcing [the debtor] to indefinitely forego contributions to her 401(k) plan seems short-sighted"). In the case at bar, the Court finds the Plaintiff's retirement contributions to be modest and reasonable.

### c. Life Insurance

Plaintiff's schedule J shows a $61.92 monthly expense for life insurance. Ex. 104. As Plaintiff is the sole breadwinner for a family of six, it is entirely reasonable to carry life insurance to provide for his dependents in the event something unfortunate befalls him. The Court cannot conclude that this small expense is an impermissible expenditure beyond a minimal standard of living under *Brunner. See In re McDowell*, 549 B.R. at 767 ("while [the creditor] criticizes it, the Court does not question Plaintiff's decision to carry life insurance coverage that would, in the event of her death, pay her beneficiary three times Plaintiff's annual income.").

### d. Charitable Contributions

Plaintiff contributes $400 per month to a charitable organization, specifically his church. This Court has previously considered the issue of charitable contributions in the context of a student loan discharge case. In *In re Ritchie*, this Court concluded that, "[a]ll factors considered, the Court construes Section 523(a)(8) to exclude religious and charitable donations as a proper expense item in determining whether a debtor would be unduly burdened by not discharging qualifying student loan debt." 254 B.R. at 921. This Court reaffirmed that holding in *Berchtold v. Educ. Credit Mgmt. Corp. (In re Berchtold)*, 328 B.R. 808, 814 (Bankr. D. Idaho 2005) ("As the Court has previously explained, a

MEMORANDUM OF DECISION − 19

voluntary contribution to a charitable organization, while laudable, is clearly not a necessary expense in [the § 523(a)(8) context.)  This Court sees no reason to deviate from those prior decisions in this case.

Accordingly, the $ 400 Plaintiff spends monthly on charitable contributions is not reasonable, and must be considered as available to pay back the Loans under the *Brunner* test.

### e.  Payments to Counsel

Plaintiff's schedules list a $300 monthly payment to Avery Law.  At trial, Plaintiff testified that those payments had concluded.  Thus, the Court considers that amount now available to pay back the Loans.

### f.  Savings

The Court will next consider whether Plaintiff's contributions to a savings account are expenses beyond a minimal standard of living under *Brunner*.  The most recent paystub indicates Plaintiff was depositing approximately eight percent of his gross income into a savings account totaling $ 241.84 per paycheck, and $483.68 monthly. Exs. 100; 102.  Plaintiff testified these funds are intended for unbudgeted expenses, vehicle repairs, and down payments toward the purchase of a vehicle or home.  In this undue hardship context, the Court views this expense with a wary eye, especially given that the savings account balance totaled $13,909.89 at the time of trial.[17]  However, the

---

[17] As noted above, some of that balance is likely attributable to Plaintiff's receipt of a $4,400 stimulus payment through the 2020 CARES Act.

MEMORANDUM OF DECISION − 20

Court finds that Plaintiff has satisfactorily explained the need for such savings. Both Plaintiff and his spouse testified that because their budget will not support large expenses, they must save each month toward those eventualities, such as vehicle and appliance repairs, moving expenses, tires for their vehicles, and the like. While saving in advance for such eventualities is prudent, the Court is mindful of the fact that the expense categories on schedule J include some of these same types of expenses. For example, Line 4c includes expenses for "home maintenance, repair, and upkeep," and Line 12 provides for the inclusion of transportation expenses other than car payments. While the Court is necessarily concerned about double dipping by Plaintiff for these expenses, it does not believe Alaina included those amounts in the expense figures on schedule J. Plaintiff testified that she handles the finances for the family. In turn, she testified that she simply took receipts and tallied them up to arrive at the expense numbers for schedule J. There is no testimony or suggestion that she looked forward or estimated foreseeable expenses and included those in her figures on schedule J, and thus the Court concludes those types of expenses have not been counted twice.

Both Plaintiff and Alaina testified that they have an expensive car repair coming up, and new tires will be necessary in the near future. In addition, they both are driving vehicles that are more than ten years old with high mileage, and both testified that due to their current debt-to-income ratio, they cannot qualify for credit or obtain a loan to pay for larger expenses, requiring them to save in advance. Although a closer call, under the particular facts presented here, the Court concludes that Plaintiff's savings account

MEMORANDUM OF DECISION – 21

contribution is not an expense beyond a minimal standard of living, and finds this expense to be reasonable.

Based upon the foregoing, the Court concludes that Plaintiff's monthly charitable contributions and payments to his attorney are not reasonable. The Court will therefore reduce Plaintiff's monthly budget by those amounts. *In re Craig*, 579 F.3d at 1045. Beginning with the monthly net income figure from above and taking the foregoing analysis into account, the Court's amended calculations are as follows:

| Adjusted Monthly Net Income Calculation After Adding in Unreasonable Expenses | |
|---|---|
| Monthly net income | $ -250 |
| Charitable contributions | + 400 |
| Payments to counsel | + 300 |
| Adjusted monthly net income | $ 450 |

### g.  The Federal Loan

There is one more outstanding payment that was not discussed much at trial which Plaintiff is not currently paying, but will almost certainly come back into play in the near future. Recall, Plaintiff has a Federal Loan with a balance of approximately $75,000 that is currently in forebearance awaiting the conclusion of an appeal of a decision rendered against he and other similarly situated graduates of the Brooks Institute. Plaintiff has stipulated with the Department of Education that the loan is nondischargeable. While this Court cannot speculate about the likelihood of success in the appeal, nor of the relief which would be granted in the event the appeal is successful, it seems unlikely the Federal Loan would be wholly eliminated. Rather, when that loan comes out of forebearance, it is subject to an income-based repayment plan. The payment amount,

MEMORANDUM OF DECISION − 22

prior to entering forebearance, was $300 per month.  While not a certainty, it is a distinct

possibility that Plaintiff will have to begin payments on that loan in the future.

Moreover, because the payments are income-based, they will increase as his income

does, and absorb much of the benefit of any future pay raises.  It would indeed be short-

sighted of the Court to ignore the likelihood that Plaintiff will have to resume making

payments toward the Federal Loan at some point.  Accordingly, "[Plaintiff's] monthly

installment payments should be increased to reflect the payments [he] has now committed

to pay to [Department of Education])."  *See In re McDowell*, 549 B.R. at 767.

As such, the Court's final tally reads this way:

| Calculation of Monthly Net Income for *Brunner* Analysis | |
|---|---|
| Adjusted monthly net income | $450 |
| Federal Loan payment expense | - 300 |
| Monthly net income for *Brunner* analysis | $150 |

The testimony is undisputed that Defendant has never offered Plaintiff a minimum

payment of less than $1,900 per month, and that offer was made many years ago.  The

evidence is also undisputed that in order to make any payment that would reduce the

principal and eventually pay off the full balance, the current minimum monthly payment

would need to be in excess of $4,500 per month.  Accordingly, as to payment of the

entirety of the Loans, the Court finds this prong of the *Brunner* test has been met, as

Plaintiff could not maintain a minimal standard of living and repay the Loans in full.

However, because Plaintiff has $150 in net disposable income remaining after

MEMORANDUM OF DECISION − 23

payment of expenses, the Court concludes that Plaintiff has not demonstrated that he would be subject to an undue hardship as to the amount of $150 each month.

### 2. Persistence of Current Situation

In order to be eligible for a discharge of student loans, the second prong of the *Brunner* test requires Plaintiff to prove both a current inability to repay the debt, as well as that "exceptional" circumstances exist demonstrating "insurmountable barriers to the [Plaintiff's] financial recovery and ability to repay the student loan now and for a substantial portion of the loan's repayment period." *Carnduff v. United States Dept. of Educ. (In re Carnduff)*, 367 B.R. 120, 128 (9th Cir. BAP 2007) (citing *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 444 (9th Cir. BAP 2004) *aff'd*, 446 F.3d 938 (9th Cir. 2006) (citing *In re Pena*, 155 F.3d at 1114) (finding that the debtors satisfied the *Brunner* test in part because "their unfortunate financial situation was likely to continue for a substantial portion of the repayment period"))).  Plaintiff must prove these required facts by a preponderance of the evidence.  *Id.*  The Ninth Circuit explained that this prong "is intended to effect 'the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt.'"  *In re Rifino*, 245 F.3d 1083, 1088–89 (citing *In re Pena*, 155 F.3d at 1111 (quoting *Brunner*, 831 F.2d at 396)).  The Ninth Circuit has held that what separates a "garden-variety debtor" from a debtor who can show "undue hardship" is the realistic possibility that a "garden-variety debtor" could improve her financial situation in the future.  *In re Nys*, 446 F.3d 938, 944 (9th Cir. 2006).  "In comparison, forcing debtors

MEMORANDUM OF DECISION − 24

who cannot reasonably be expected to increase their future income to make payments on their student loans when it causes them to fall below a minimal standard of living constitutes an 'undue hardship.'" *Id.*

In considering this prong, the Court begins with the presumption that Plaintiff's income will increase to a point where he can make payments and maintain a minimal standard of living. However, Plaintiff may rebut that presumption with "additional circumstances" indicating that his income cannot reasonably be expected to increase and that his inability to make payments will likely persist throughout a substantial portion of the Loan's repayment period. *In re Nys*, 446 F.3d at 946. However, the Court notes that the "additional circumstances" need not be "exceptional" in the sense that Plaintiff must prove a "serious illness, psychiatric problems, disability of a depend[e]nt, or *something* which makes [his] circumstances more compelling than that of an ordinary person in debt." *Id.* (quoting *In re Nys,* 308 B.R. at 444 (internal quotation marks omitted) (emphasis in original)). Moreover, the Ninth Circuit clarified the opinion in *In re Nys,* holding that a "debtor does not have a separate burden to prove 'additional circumstances,' beyond the inability to pay presently or in the future." *In re Mason*, 464 F.3d at 882–83 (citing *In re Nys,* 446 F.3d at 945 (holding that that bankruptcy court erred in requiring debtor to show exceptional circumstances beyond the inability to pay in the present and a likely inability to pay in the future)).

The rule of the "additional circumstances" is to aid debtors in proving that their present financial situation will persist well into the future, as it is difficult for the Court to

MEMORANDUM OF DECISION − 25

predict future income.  *In re McDowell*, 549 B.R. 768 (citing *In re Nys*, 446 F.3d at 945).

An unexhaustive list of representative circumstances was provided by the Bankruptcy

Appellate Panel and utilized on appeal by the Ninth Circuit in *In re Nys*:

> (1) Serious mental or physical disability of the debtor or the debtor's
> dependents which prevents employment or advancement; (2) The debtor's
> obligations to care for dependents; (3) Lack of, or severely limited
> education; (4) Poor quality of education; (5) Lack of usable or marketable
> job skills; (6) Underemployment; (7) Maximized income potential in the
> chosen educational field, and no other more lucrative job skills; (8) Limited
> number of years remaining in [the debtor's] work life to allow payment of
> the loan; (9) Age or other factors that prevent retraining or relocation as a
> means for payment of the loan; (10) Lack of assets, whether or not exempt,
> which could be used to pay the loan; (11) Potentially increasing expenses
> that outweigh any potential appreciation in the value of the debtor's assets
> and/or likely increases in the debtor's income; (12) Lack of better financial
> options elsewhere.

*In re Nys,* 308 B.R. at 446-47; 446 F.3d at 947; *see also In re McDowell*, 549 B.R. at 768.

The case law requires neither a specific number, nor a majority, nor in truth, any single

one of these factors to be met.  Rather, the Court is looking for facts which tend to show

that Plaintiff's present financial situation will more likely than not persist well into the

future.

In the case at bar, the Court finds several of the *Nys* factors to be present.  Plaintiff

has ongoing obligations to care for dependents.  He has four young children; at least two

are not yet in school and one is still in diapers, thus his financial obligations as a parent

will continue for many years into the future.  Moreover, Plaintiff proved through his own

experience that relocation will not assist him in repaying the Loans, as his employment in

the past paid less, was not steady, and provided no benefits.  At his current job, Plaintiff

MEMORANDUM OF DECISION − 26

receives a decent salary and good benefits, and is making more than ever before. Furthermore, if he chooses to pursue work in a different field than that supported by his college degree, the Court predicts he may earn less than his current job pays.

The record is also clear that he lacks assets with which to repay the Loans. The couple has only a small sum in savings and retirement, no real property, and two older used vehicles. Finally, while their expenses will almost certainly increase as their children grow older, Plaintiff's situation is compounded by the fact that the Federal Loan, while currently in forebearance, is subject to an income-based repayment plan. Thus, any increases in Plaintiff's income will result in increases in the Federal Loan payment amount.

In addition, while Plaintiff is utilizing the benefits of his college degree, and he is young, healthy, and has many wage-earning years ahead of him, he has demonstrated that he has likely maximized his income potential in his chosen field. At BYU-I, he has ascended the ranks to the point where he has become a supervisor, but such may prove to be the ceiling of his employability. He testified that he has applied for numerous jobs both inside and outside of the university, but has not received any offers. Therefore, the Court concludes Plaintiff has shown it is more likely than not that his financial situation will not vastly improve in the future.

In his current position, the Court believes Plaintiff cannot expect to see any large increases in income, but rather will probably only receive modest cost of living increases going forward. And while this position is steady and pays more than Plaintiff has ever

MEMORANDUM OF DECISION − 27

earned before, it also limits his time to make side income doing video editing and other projects for paying customers.  The Court does not find this to be material to the analysis, however, as the side income never brought in a great deal of extra income anyway. Plaintiff testified at trial of a hope to one day secure a faculty position, which would provide a larger salary, but at this point, that goal is merely aspirational, and it is unclear if Plaintiff is even currently qualified for such a position.  Finally, while his spouse is pursuing her degree and eventually hopes to teach school, that prospect is at least 4-5 years away, and is by no means a sure thing.  Most importantly, Plaintiff's income would have to increase dramatically in order to repay the entire amount of the Loans in the future.  Assuming he would need to make monthly payments of at least $5,000, his *net* income would need to increase by at least $60,000 annually.  And while the Court has found that Plaintiff has $150 in monthly disposable income available now to pay toward the Loans, the Court does not expect that amount to increase substantially in the future, in part because Plaintiff's Federal Loans are payable according to an income-based repayment plan.  As such, any salary increases he obtains will result in higher payment requirements for the Federal Loans.

Taking these facts together, the Plaintiff has established that he does not have the current ability to pay the entire amount of the Loans, and, from the facts presented, it appears likely that this inability will persist in the future.  Therefore, the Court finds the second prong of the *Brunner* test is met.

MEMORANDUM OF DECISION − 28

### 3. Good Faith Effort to Repay

The final prong in the *Brunner* test requires the Plaintiff to demonstrate that he has made a good faith effort to repay the debt. "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." *In re Birrane,* 287 B.R. at 499 (citations omitted); *see also In re Pena,* 155 F.3d at 1114. The Ninth Circuit Bankruptcy Appellate Panel summarized some of the factors to consider when measuring a student loan borrower's good faith:

> 1) whether the debtor has made any payments on the loan prior to filing for discharge, "although a history of making or not making payments is, by itself, not dispositive"; 2) whether the debtor has sought deferments or forebearances; 3) the timing of the debtor's attempt to have the loan discharged; and 4) whether the debtor's financial condition resulted from factors beyond her reasonable control, as a debtor may not willfully or negligently cause her own default.

*In re Roth*, 490 B.R. 908, 917 (9th Cir. BAP 9th Cir. 2013) (internal citations omitted). The Court has already noted Plaintiff's efforts to obtain employment, maximize his income, as well as the family's frugal lifestyle. It will now consider these other factors.

### a. Payment History

Considering the facts presented here in light of those factors, the Court will first examine whether Plaintiff has made any payments on the Loans prior to filing for discharge. The facts regarding Plaintiff's attempts to repay the Loans are not overly well developed. Plaintiff testified that he made payments in the amount of approximately $600 each toward the Loans for a short period of time following his graduation in 2007. He also testified that he was required to make a $150 payment each time he requested

MEMORANDUM OF DECISION − 29

forebearance during the early years following graduation.  The record from Navient, which spans the time period from July 2004–July 2013, belies that testimony somewhat. It shows a payment of $50 on each of the three loans on January 20, 2009.  Ex. 202. Those payments were credited toward fees, rather than interest or principal.  *Id.* However, the Court acknowledges the possibility that Plaintiff made the payments to the Federal Loan.  At one point during trial Plaintiff testified that he believed the income-based repayment program that he had entered into was for all of the student loans, and only later discovered that the private Loans were not a part of that agreement.  There was no timeline associated with that testimony.  He also testified that when he made payments, he did not know to whom they were disbursed.  Recall, Navient is the servicer for the Federal Loans as well as the private Loans.  The Court finds credible Plaintiff's testimony that he made some student loan payments in prior years.

### b.  Deferments and/or Forebearances

Next, the Court will consider whether the Plaintiff has sought deferments or forebearances.  Plaintiff testified that he has spoken to the lender regularly over the course of the lending relationship, and while he was never able to negotiate a payment amount that was within his budget, the Loans were placed in forebearance on numerous occasions.  This testimony is undisputed.  While the forebearances are not listed on the account history submitted by Defendant, the Court does not know if forebearances would

MEMORANDUM OF DECISION − 30

normally be listed on this document.[18]  However, capitalized interest appears seven times for each loan, which Plaintiff testified is associated with forebearances.  It is also Plaintiff's observation that by obtaining forebearances, he actually made his financial position materially worse, as Defendant capitalizes interest with each forebearance, resulting in a much larger principal amount with correspondingly greater interest accrual.

### c.  Timing of Attempted Discharge

The next factor for the Court to consider is the timing of the debtor's attempt to have the Loans discharged.  Courts have looked askance at debtors who seek to discharge their student loans shortly after graduation, but such is not the case here.  Plaintiff filed for bankruptcy three years after graduation, but did not seek to discharge his student loans at that time, but instead unsuccessfully attempted to use bankruptcy to free up enough monthly income to pay his student loans.  He filed the instant bankruptcy case and adversary proceeding more than a decade after graduation.

### d.  Cause of Plaintiff's Financial Condition

The last factor the Court will consider regarding Plaintiff's good faith effort to repay the loans is whether the debtor's financial condition resulted from factors beyond his reasonable control.  Within this factor, the Court is generally tasked with considering whether Plaintiff in any way willfully or negligently caused his own default.  The Court has carefully considered Plaintiff's situation.  He fell victim to unscrupulous marketing

---

[18] No representative of the Defendant testified at trial, thus the documents submitted in evidence were not explained.

MEMORANDUM OF DECISION − 31

promises and pursued an education that, while it provided him marketable skills and made him employable, was almost certainly not going to produce sufficient income to repay the loans. But he doggedly worked in the field and pursued additional knowledge on his own time to make him more skilled and therefore more employable. Finally, he landed a decent paying job with good benefits, but by the time he got to this point, the loans had ballooned so far beyond his ability to pay that he realistically has no hope of ever paying off the full amount short of an unexpected inheritance or lottery win. All the while, he and his family have been living frugally, staying out of debt, and trying to save for emergencies and retirement, understanding that both will come eventually. He admits that he would not have placed the loans into forebearance had he understood the principle of interest capitalization, and that has proved a costly mistake. The Court, however, cannot find that Plaintiff was negligent in pursuing this action. Indeed, as Plaintiff pointed out, had he not placed the loans in forebearance, the Court would likely not find that he made a good faith attempt to repay the loans. Furthermore, while Plaintiff's salary provides enough income to permit a certain amount of savings and retirement, the glaring fact that Plaintiff understands is that no amount he can possibly pay on the Loans will ever make a difference. The sheer amount of fees, the capitalized interest, and the applicable interest rate make the principal untouchable. In sum, the Court does not find that Plaintiff willfully or negligently caused his own default. Accordingly, the Court concludes that Plaintiff has demonstrated a good faith effort to repay the Loans.

MEMORANDUM OF DECISION – 32

Having found all three *Brunner* factors have been met with regard to the full amount of the Loans, the Court now turns to the question of whether Plaintiff is nevertheless able to pay some amount toward the Loans.

D.    The Case for a Partial Discharge

The discharge of student loans is not an all or nothing proposition.  The Court has discretion to consider a partial discharge.  *In re Carnduff*, 367 B.R. at 131; *In re Saxman*, 325 F.3d 1168, 1173 (9th Cir. 2003) (We "conclude that bankruptcy courts may exercise their equitable authority under 11 U.S.C. § 105(a) to partially discharge student loans.") Put another way, in light of the evidence of Plaintiff's current income and expenses, the Court must determine whether, consistent with a "minimal" standard of living, the Plaintiff currently can pay some, all, or none of the student loan debt.  *In re Carnduff*, 367 B.R. at 131 (citing *Pena,* 155 F.3d at 1111 (quoting *Brunner,* 831 F.2d at 396)).

A debtor who wishes to obtain a discharge of his student loans has the burden to establish the portion of the debt that results in undue hardship, and to demonstrate that it meets the requirements of § 523(a)(8) as to that portion.  *Id.* (citing *In re Saxman,* 325 F.3d at 1174-75); *In re Mason*, 464 F.3d at 884.  The bankruptcy court has discretion in determining the amount and terms of payment of a partial discharge.  *In re Jorgensen*, 479 B.R. at 86 (citing *Bossardet v. Educ. Credit Mgmt. Corp. (In re Bossardet),* 336 B.R. 451, 457 (Bankr. D. Ariz. 2005)); *In re McDowell*, 549 B.R. at 772–73.

The Court has previously concluded that the second and third prongs of the *Brunner* test have been met, and, regarding the first prong, the Court concluded that

MEMORANDUM OF DECISION − 33

repayment of the Loans would present an undue hardship in monthly terms for all payments over $150.  The Court is mindful of the case law holding that it is Plaintiff's burden to establish the portion of the debt to be discharged—the portion that results in undue hardship.  *In re Carnduff*, 367 B.R. at 131 (citing *In re Saxman,* 325 F.3d at 1175.) However, despite Plaintiff's admission at trial that he could likely pay something toward the Loans, his counsel reiterated that he was not asking for a partial discharge.  As such, neither Plaintiff nor Defendant established any amount for a partial discharge.  However, what the parties proved at trial was Plaintiff's income and his expenses.  Taking those figures, the Court had only to perform the necessary calculations to arrive at the amount Plaintiff can pay each month that will not present an undue hardship.  Indeed, the first prong of the *Brunner* test allows the bankruptcy court to determine the amount of student loan debt that prevents the debtor from maintaining a minimal standard of living and discharge only that amount.  *In re Jorgensen*, 479 B.R. at 86.

That is what this Court does here.  Having previously found that all of the *Brunner* prongs are satisfied for any payments Plaintiff can make in amounts above $150 per month, the Court concludes Plaintiff is entitled to a partial discharge.  As noted above, the Court has discretion about how to fashion the terms of payment in a partial discharge situation.

MEMORANDUM OF DECISION – 34

Here, the Court has carefully examined Plaintiff's tight financial picture, and concludes that only $150 remains after the payment of other reasonable expenses, and thus the Court will endeavor to fashion a discharge that reflects that reality.[19]

Taking the $150 in available income per month, and multiplying that amount by 12 months results in a payments of $1,800 per year.  As Plaintiff is now 40 years old, and can be expected to work until age 65, if the Court multiplies the $1,800 yearly payment by Plaintiff's twenty-five remaining earning years, this yields the sum of $45,000.  This represents the amount Plaintiff can pay while still maintaining a minimal standard of living.  The Court holds that the Loans should be discharged above and beyond this amount.  Moreover, because the Court has tailored the payment amount closely to Plaintiff's finances, interest will not accrue on the $45,000 principal amount that is not subject to discharge.  The Court will not set any other specific payment terms.

### *Conclusion*

The Court concludes that the requirements of *Brunner* have been met and that a partial discharge of Plaintiff's student loan debt owed to Defendant is warranted with the exception of $45,000 of the Loans, which will not be subject to discharge.

---

[19] While there are other potential sources of funds available to the Plaintiff, such as income tax refunds and the rare stimulus payment, such as the CARES Act payment of this year, the Court does not consider those to be regular sources of income which Plaintiff can count on to make payments on the Loans.

MEMORANDUM OF DECISION − 35

Plaintiff is to prepare a judgment and submit it to the Court after Defendant agrees as to its substance.



DATED:  October 15, 2020

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION − 36